### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOAN STARR,** *individually* | : | **No. 3:03cv636** |
| *and as Administratrix of the* | : | |
| *Estate of Raienha P. Bechtel and Jacob* | : | **(Judge Munley)** |
| *Bechtel*, | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SCOTT PRICE; ELIZABETH HONICKER;** | : | |
| **SCHUYKILL COUNTY; FRANCIS** | : | |
| **MCANDREW; CHRISTOPHER BAYZICK;** | : | |
| **THOMAS POWELL; ROBERT BETNAR;** | : | |
| **and WESLEY LEVAN,** | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### <u>MEMORANDUM</u>

Presently before the Court for disposition are two motions for summary judgment, the first filed by Defendants Schuykill County and Sheriff Francis McAndrew (collectively "Schuykill Defendants"), and the second by Defendants Corporal Scott Price, Police Communication Supervisor Elizabeth Honicker, Pennsylvania State Trooper Christopher Bayzick, Trooper Thomas Powell, Trooper Robert Betnar, and Trooper Wesley Levan (collectively "Commonwealth Defendants").  Plaintiff Joan Starr ("Plaintiff") is the mother of Raienhna Bechtel and grandmother of Jacob Bechtel, both deceased.  She seeks relief pursuant to 42 U.S.C. § 1983, alleging that the defendants violated the deceased's constitutional rights by returning a firearm to Raienhna's husband, Michael Harvey Bechtel, which he subsequently used to murder Raienhna, Jacob, and two other individuals.

The parties have fully briefed and argued these matters, and thus, they are ripe for

disposition.  For the reasons that follow, we will grant summary judgment for the defendants

and dismiss this case.

## I.      Background

The background facts leading to the deaths of Raienhna and Jacob are tragic and largely

undisputed.  Raienhna and Michael had a history of domestic violence that included incidents

on September 23, 2001, and December 25, 2001, where the Pennsylvania State Police

intervened.  (Pl. Counter Statement of Facts to Commonwealth Motion ("Pl. Ex.") Ex. A at 24-

26, Tarson Dep.; Pl. Ex. B at 23, Bayzick Dep.; Pl. Ex. C at 24, Powell Dep.).  During the

second incident, Michael informed the troopers he had firearms on his person, but they did not

seize the weapons.  (Pl. Ex. B at 23-26; Ex. C at 16, 20-22).

On March 14, 2002, Troopers Wesley Levan and Robert Betnar arrived at the Bechtel

residence following a report of domestic violence.  (Pl. Ex. E at 8, Levan Dep.; Pl. Ex. F at 7-8,

Betnar Dep.).  Michael informed the officers that he had two firearms on his person.  (Pl. Ex. E

at 12; Pl. Ex. F at 20).  Both he and Raienhna denied that he used the weapons in the incident.

(Pl. Ex. E at 15; Pl. Ex. F at 28).  Troopers Levan and Betnar asked if they could retain the

firearms, and Michael provided the guns without complaint.  (Pl. Ex. E at 21; Pl. Ex. F at 30).

The troopers personally transported Michael to his friend's residence for the evening.  (Pl. Ex.

E at 20-22; Pl. Ex. F at 30).   Trooper Levan suggested that Raienhna obtain a Protection From

Abuse Order ("PFA") and explained the application process.  (Pl. Ex. E at 16).

After transporting Michael to his friend's house, Troopers Levan and Betnar brought the

firearms to the Frackville Pennsylvania State Police barracks, determined that they were

2

registered in Michael's name with the Schuykill County Sheriff's office, and placed them in an evidence room. (Pl. Ex. E at 23; Pl. Ex. F at 24-25, 35). Trooper Betnar then sent an e-mail to Corporal Scott Price relating the facts of the incident and explaining that he had confiscated two weapons. (Pl. Ex. G at 13-14, Price Dep.).

Later that same day, March 14, 2002, Raienhna obtained a temporary PFA. (Pl. Ex. H, Temporary PFA). In the application process, Raienhna completed a Schuykill Women in Crisis PFA worksheet. (Commw. Def. Ex. J, PFA worksheet). The worksheet contained a space for the applicant to describe the weapons that were used in the incident of domestic violence, and Raienhna's application provided no response in this space. (Commw. Def. Ex. J). When the temporary PFA was issued, it did not refer to the confiscated firearms or indicate that any firearm was used in the incident. (Pl. Ex. H, Temporary PFA). It did provide notice to law enforcement agencies that "[s]ubsequent to an arrest [for a violation of the Final PFA], the law enforcement officer shall seize all weapons used or threatened to be used during the violation of this Order OR during prior incidents of abuse." (Id.).

On March 18, 2002, pursuant to an agreement between Michael and Raienhna, Raienhna obtained a Final PFA. (Commw. Def. Ex. O, PFA Hearing Transcript, Pl. Ex. K, Final PFA). The PFA stated "Defendant shall not abuse, stalk, harass, threaten the Plaintiff or any other protected person in any place where they might be found." (Pl. Ex. K ¶ 1). Regarding firearms, it directs, "Defendant is prohibited from possessing, transferring or acquiring any other firearms license or weapons for the duration of this order. Any weapons and/or firearms license delivered to the sheriff pursuant to this order or the Temporary Order shall not be

returned until further order of the court." (Pl. Ex. K ¶ 6). It includes the following notice to

law enforcement officers:

> This Order shall be enforced by the police who have jurisdiction over the
> plaintiff's residence OR any location where a violation occurs OR where the
> defendant may be located. . . .An arrest for violation of Paragraphs 1 through
> 6 of this order may be without warrant, based solely on probable cause,
> whether or not the violation is committed in the presence of the police. 21
> PA.C.S. § 6113.
> Subsequent to an arrest, the law enforcement officer shall seize all weapons
> used or threatened to be used during the violation of this Order OR during
> prior incidents of abuse. The [sic] shall maintain possession of the weapons
> until further order of this Court.

(Pl. Ex. K).

In conjunction with the Final PFA, the Schuylkill County Prothonotary issued a

Pennsylvania State Police data sheet. (Pl. Ex. L at 4-5, 25-26). The data sheet contained

Michael and Raienhna's personal information, such as birthdays, names, and addresses, and was

created by a computer program called the Protection From Abuse Database ("PFAD") for the

benefit of the Pennsylvania State Police. (Id. at 25-27). It also contained protection codes

describing the conditions of the Final PFA. (Id. at 27). Raienhna's final data sheet contained

numerous protection order codes, including a code of "07". (Pl. Ex. M, Pennsylvania State

Police Protection from Abuse Datasheet). This code indicates that "the subject is prohibited

from possessing and/or purchasing a firearm or other weapon." (Pl. Ex. O, Protection From

Abuse Datasheet Code Overlay). Her datasheet also included a box entitled "Brady Indicator,"

marked "No." (Pl. Ex. M).

On April 15, 2002, Michael Bechtel returned to the Frackville Barracks to retrieve his

guns. (Id. at 38-39). Corporal Price believed that he had no right to withhold the guns from

4

Michael any longer.  (Pl. Ex. G at 33-34, 40).  Therefore, he returned the two firearms, a nine

millimeter Beretta and a nine millimeter Kel-tec.  (Id. at 38-39, Commw Ex. F at ¶ 10, Michael

Bechtel Decl.).

On August 15, 2002, Michael used the nine millimeter Beretta to kill Raienhna, Jacob,

and two other adults.  (Commw. Ex. F at ¶ 11).  At the time he committed the murders he had

access to another nine millimeter handgun.  (Id. at ¶ 22).  Michael's housemate kept the

weapon in a holster next to his bed in his unlocked bedroom.  (Id.).  Thus, Michael admits that

he would have used this weapon to kill Raienhna and Jacob had Corporal Price not returned his

Beretta.  (Id. at ¶ 20-22).  On January 21, 2004, he pleaded guilty to four counts of first degree

murder and numerous lesser charges, and was sentenced to four consecutive life sentences.

(Commw. Ex. F. at ¶ 12-13).

## II.      Standard

Granting summary judgment is proper if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law.  See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV.

P. 56(c)).  "[T]his standard provides that the mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no genuine issue of material fact."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the

light most favorable to the party opposing the motion.  <u>International Raw Materials, Ltd. v. Stauffer Chemical Co.</u>, 898 F.2d 946, 949 (3d Cir. 1990).  The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party.  <u>Anderson</u>, 477 U.S. at 248 (1986).  A fact is material when it might affect the outcome of the suit under the governing law.  <u>Id.</u>  Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial.  <u>Celotex v. Catrett</u>, 477 U.S. 317, 322 (1986).  Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial.  <u>Id.</u> at 324.

### III.    Discussion

Plaintiff advances eight counts pursuant to 42 U.S.C. § 1983 ("section 1983") for alleged violations of the deceased's constitutional and federal statutory rights.

In pertinent part, section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

Thus, a plaintiff must establish two criteria to state a claim under section 1983. First, the conduct complained of must have been committed by a person acting under color of state law. Second, the conduct must deprive the complainant of rights secured under the Constitution or federal law. Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 142 F.3d 582, 590 (3d Cir. 1998).

Plaintiff alleges that the defendants violated the deceased's Fourteenth Amendment procedural and substantive due process rights, as well as their Brady Act, 18 U.S.C. § 922(d)(g) rights.[1] The defendants contend that Plaintiff has failed to establish a protected right. We will analyze each alleged right separately. For the reasons that follow, we find that no genuine issue of material fact that neither the Due Process Clause nor the Brady Act protects Plaintiff's interests.[2]

A.      **Substantive Due Process**

The substantive component of the Due Process Clause protects "those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' . . . and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would

---

[1] Plaintiff's complaint also advances an equal protection claim pursuant to section 1983. Plaintiff consents to summary judgment on this claim. (Pl. Br. in Opp. Summ. J. Doc. 68, at 2; Oral Arg. Tr. at 18). Additionally, Plaintiff consents to dismissal of Count V, her First Amendment claim, and Counts VI, VII and VIII to the extent that they seek relief from the Commonwealth Defendants. (Id.).

[2] The defendants also seek summary judgment on the grounds that they are entitled to qualified immunity. Qualified immunity shields "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). As we find no constitutional violation, we need not address the issue of qualified immunity.

7

exist if they were sacrificed.'"  Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997)

(quoting Moore v. East Cleveland, 431 U.S. 494, 503 (1977); Snyder v. Massachusetts, 291

U.S. 97, 105 (1934); Palko v. Connecticut, 302 U.S. 319, 325, 326, (1937)).  A plaintiff

asserting a substantive due process right must provide "a 'careful description' of the asserted

fundamental liberty interest."  Id. at 721 (citing Reno v. Flores, 507 U.S. 292, 302 (1993);

Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992); Cruzan v. Director, Missouri

Department of Health, 497 U.S. 261, 277-78 (1990)).

        Plaintiff advances a "state-created danger" substantive due process claim.  She asserts

that by returning Michael's guns, the defendants created the danger that lead to Raienhna's and

Jacob's deaths.  The state created danger theory derives from DeShaney v. Winnebago County

Deparment of Social Services, 489 U.S. 189 (1989).  In DeShaney, the plaintiff, four year-old

Joshua DeShaney, was repeatedly physically abused by his father.  Id. at 192.  The defendant,

Winnebago County Department of Social Services ("DSS"), knew of numerous complaints and

incidents of abuse.  Id.  On one occasion, DSS temporarily took custody of Joshua.  Id.  It

returned him to his father's custody in exchange for his father's agreement to comply with

specific conditions.  Id.  Later, DSS learned that his father violated the agreement, but it did not

remove Joshua from his custody.  Id. at 192-93.  Thereafter,  Joshua's father beat him so

severely that he fell into a coma, and suffered brain injuries "so severe that he is expected to

spend the rest of his life confined to an institution for the profoundly retarded."  Id.  at 193.

        Joshua and his mother sued DSS, alleging it violated his substantive due process rights

by "failing to intervene to protect him against a risk of violence at his father's hands of which

they know or should have known." Id.   The Supreme Court rejected his claim, reasoning that "the Due Process Clauses generally confer no affirmative right to governmental aid, even when such aid may be necessary to secure life, liberty, or property interest of which the government itself may not deprive the individual." Id. at 196.  It rejected the "special relationship" argument, which theorized that because DSS took steps to protect Joshua, it "acquired an affirmative 'duty' . . .to do so in a reasonably competent fashion." Id. The Court explained that "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." Id. at 200.  Finally, the Court reasoned, "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him more vulnerable to them." Id.  at 201.

Courts have since seized upon this language to create a state created danger theory of liability, which provides that where the state creates a danger and renders an individual more vulnerable to it, the individual has a substantive due process right to state protection. See Morse v. Lower Merion School District, 132 F.3d 902, 907 (3d Cir. 1997) (holding that, following DeShaney, the state created danger theory is a viable cause of action under the Substantive Due Process Clause).  A state actor is liable if:

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) the
> state actor acted in willful disregard for the safety of the plaintiff; (3)
> there existed some relationship between the state and the plaintiff; (4) the
> state actors used their authority to create a situation that otherwise would
> not have existed for the third party's crime to occur.

Kneipp v. Tedder, 95 F.3d 1199, 1208 (3d Cir. 1996).

In the instant case, the defendants argue that Plaintiff has failed to establish any of these elements. Plaintiff argues that the state rendered Raienhna and Jacob more vulnerable to Michael because he would have been unable to murder them without the firearm he obtained from Corporal Price. The defendants counter that Michael admits that he had access to another gun and would have used it to commit the murder whether or not Corporal Price returned his gun to him. (Commw. Ex. F at ¶ 20-22). As we find that no genuine issue of material fact exists regarding the fourth element, we will grant the defendants' motions for summary judgment on Plaintiff's substantive due process claim.

DeShaney illustrates that the defendants did not create the danger in question. There, DSS took custody of Joshua but subsequently returned him to his father. DeShaney, 489 U.S. at 192. The Court held:

> That the State once took temporary custody of Joshua does not alter the
> analysis, for when it returned him to his father's custody, it placed him in
> no worse position than that in which he would have been had it not acted at
> all; the State does not become the permanent guarantor of an individual's
> safety by having once offered him shelter. Under these circumstances,
> the State had no constitutional duty to protect Joshua.

Id. at 201.

Similarly, although the defendants took custody of the gun, when they returned it to Michael they placed Raienhna and Jacob in no worse position than had they not acted at all.[3]

---

[3] Although we do not rely on it as precedent, we are guided by the reasoning of the non-precedential opinion in Green v. City of Philadelphia, 92 Fed. Appx. 873, 875-76 (3d Cir. 2004). In Green, the plaintiff's domestic partner shot him with a gun that the police had previously confiscated during a domestic incident, but later returned. Id. at 874. The court found that the police did not create the

Furthermore, the defendants have produced Michael Bechtel's uncontradicted admission that he had access to another firearm. (Commw. Ex. F at ¶ 20-22).  Thus, whether or not Corporal Price returned the weapon, Michael would have had the same opportunity to murder Raienhna and Jacob. (Id.).  Accordingly, we find that Plaintiff has not established a genuine issue of material fact that the defendants created the danger that lead to Raienhna's and Jacob's deaths, and we will grant the motions for summary judgment on Plaintiff's substantive due process claim.

### B.    Procedural Due Process

Plaintiff argues that the deceased had a property interest in the enforcement of the PFA, which the defendants violated by returning the firearms.  "The Fourteenth Amendment procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits."  Roth v. Board of Regents of State Colleges, 408 U.S. 564, 576 (1972).  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  Id. at 577.

Plaintiff argues that under Roth, Raienhna and Jacob had a legitimate claim of entitlement to police enforcement of the terms of the PFA.  She argues that the PFA created the property interest, and emphasizes that, "[p]roperty interests, of course, are not created by the Constitution.  Rather, they are created and their dimensions are defined by existing rules or

---

danger in question because the plaintiff was in no greater danger than he would have been without the temporary intervention. Id. at 875-76.

understandings that stem from an independent source such as state law." Id.   Plaintiff relies on

Coffman v. Wilson Police Department, 739 F. Supp. 257 (E.D. Pa. 1990), where the court

found that a Pennsylvania PFA created a legitimate claim of entitlement.  Coffman recognized

that "the [PFA] statute itself creates no property interest protected by Roth," but found that the

language of the PFA itself, which mandated that the police enforce the order, created a

legitimate claim of entitlement.  Id.

      In light of the Supreme Court's recent decision in Town of Castle Rock v. Gonzalez,

125 S.Ct. 2796 (2005), we find that Coffman is not an accurate statement of the law.  In Castle

Rock, respondent Jessica Gonzales obtained a restraining order against her estranged husband

in Colorado State court.  Id. at 2800.  The restraining order contained a notice to law

enforcement outlining the Colorado statutory duties to enforce the order.  Id. at 2804-05.  The

notice included the following mandatory language:

> A peace officer shall use every reasonable mens to enforce a restraining
> order. . . .A peace officer shall arrest, or, if an arrest would be impractical
> under the circumstances, seek a warrant for the arrest of a restrained
> person . . . .A peace officer shall enforce a valid restraining order whether
> or not there is a record of the restraining order in the registry.

Id. at 2805 (emphasis added).

      The restraining order specified that the respondent's husband had the right to visit their

three daughters solely "on alternate weekends, for two weeks during the summer, and 'upon

reasonable notice,' for a mid-week dinner visit."  Id. at 2801.  While this order was in effect,

he absconded with his daughters without prior notice.  Id.  The police ignored the respondent's

repeated requests to apprehend her husband and enforce the order.  Id.  at 2801-02.  The police

took no action until her husband arrived at the police station, opened fire, and was killed by their return fire.  Id.  "Inside the cab of his pickup truck, they found the bodies of all three daughters, whom he had already murdered."  Id.

The Tenth Circuit found that Colorado law created an entitlement to the enforcement of the restraining order because the "'court issued restraining order . . .specifically dictated that its terms must be enforced' and a 'state statute commanded enforcement.'"  Id. at 2803.  The Supreme Court reversed, stating "[a]lthough the underlying substantive interest is created by 'an independent source such as state law,' *federal constitutional law* determines whether that interest rises to the level of a 'legitimate claim of entitlement protected by the Due Process Clause.'"  Id. at 2803-04 (quoting Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 9 (1978).  It found that the mandatory language in the PFA was insufficient to create an entitlement protected by the Due Process Clause because of the "deep-rooted nature of law-enforcement discretion, even in the presence of seemingly mandatory legislative commands."  Id. at 2806.

> In each and every state there are long-standing statutes that, by their terms, seem to preclude nonenforcement by the police . . . However, for a number of reasons, including their legislative history, insufficient resources, and sheer physical impossibility, it has been recognized that such statutes cannot be interpreted literally. . .[T]hey clearly do not mean that a police officer may not lawfully decline to make an arrest.  As to third parties in these states, the full-enforcement statutes simply have no effect, and their significance is further diminished.

Id. (quoting 1 ABA STANDARDS FOR CRIMINAL JUSTICE 1-4.5, commentary pp. 1-124 to 1-125 (2d ed. 1980)).

Thus, the Court found that a "true mandate of police action would require some stronger

indication from the Colorado Legislature than 'shall use every reasonable means to enforce a restraining order.'"  Id. (quoting COLO. REV. STAT. § 18-6-803.5(3)(a)).  Turning to the terms of the restraining order statute, the Court found no such indication.  Id.  It reasoned that "[a]lthough Colorado's statue spoke of 'protected person[s]' such as respondent, it did so in connection with matters other than the right to enforcement.'"  Id. at 2808.  It further contrasted the protected individual's "express power to 'initiate' civil contempt proceedings" with her "mere ability to 'request' initiation of contempt proceedings.'"  Id. at 2809.

Plaintiff attempts to distinguish Castle Rock by arguing that it holds that the *statute* did not create an entitlement, whereas her claim is based on the terms of the PFA itself.  Plaintiff misconstrues Castle Rock, which held that mandatory terms in a restraining order are insufficient to create a property interest protected by the Due Process Clause.  Castle Rock, 125 S.Ct. 2805-10.  The restraining order in Castle Rock contained specific mandates to law enforcement, which the police ignored.  Id.  "A peace officer shall use every reasonable mens to enforce a restraining order. . . .A peace officer shall arrest. . . .A peace officer shall enforce a valid restraining order ."  Id. at 2805.  The terms of Raienhna's PFA are in no sense more mandatory than the terms of the restraining order in Castle Rock.  Her PFA states, "This Order shall be enforced by the police who have jurisdiction over the plaintiff's residence."  (Pl. Ex. K).[4]  Castle Rock found such a mandate insufficient to create an entitlement protected by the

_____

[4] Furthermore, Raienhna's Final PFA provides no clear mandate to the police to confiscate the specific weapons in question, and in fact omits the term that would have required Michael Bechtel to relinquish them.  Her Final PFA is a nearly verbatim copy of the final PFA form provided in Pennsylvania Rule of Civil Procedure 1095.  Rule 1905(e) states:

Due Process Clause because of the discretion typically afforded to law enforcement. 125 S.Ct.

2805-10.  In light of this discretion, the Court turned to the statute for some additional indicia

of a mandate beyond the mere language of the protection order.  Id.

Plaintiff has highlighted no statutory provision that demonstrates an entitlement to

enforcement of the PFA.  Our review of the Pennsylvania PFA Act, 23 Pa.C.S.A. §§ 6101-14.1

("the Act") reveals no indication that the discretion typically afforded law enforcement is

inapplicable to the enforcement of PFAs.  The Act, just like the Colorado law in question in

Castle Rock, creates no connection between the protected class of individuals and a right to

police enforcement.  See 23 PA.C.S.A. § 6105 (listing law enforcement's responsibilities

under the PFA Act).

Moreover, the Act grants government officials broad discretion to decline to prosecute

---

[t]he Final Order of Court entered pursuant to the [PFA] Act shall be substantially in the following form: . . . .

[ ] 6. Defendant shall immediately turn over to the Sheriff's Office, or to a local law enforcement agency for delivery to the Sheriff's Office, the following weapons used or threatened to be used by Defendant in an act of abuse against Plaintiff and/or the minor child/ren: _____

[ ] 7. Defendant is prohibited from possessing, transferring or acquiring any other weapons for the duration of this Order. Any weapons delivered to the sheriff under Paragraph 6 of this Order or under Paragraph 6 of the Temporary Order shall not be returned until further order of court.

PA. R. CIV. P. 1905.

Paragraph six of Raienhna's Final PFA is a verbatim copy of paragraph seven of the Rule 1905 form.  Her Final PFA, however, omits paragraph six of the form, which is the paragraph that would have required Michael to relinquish his firearms.

a violation of a PFA.  If a defendant violates a PFA, the plaintiff has the right to file either a

petition for civil contempt with the issuing court, 23 PA.C.S.A. § 6114, or to file a private

criminal complaint, 23 PA.C.S.A. § 6113.1.  When an individual files a private criminal

complaint, the district attorney has the discretion to refrain from proceeding for policy

reasons.  In re Private Criminal Complaint of John Wilson,  – A.2d –, No. 211-WDA-2003,

2005 WL 1324723, at * 10 (Pa. Super. Ct. June 6, 2005).

> A district attorney is permitted to exercise discretion to refrain from
> proceeding in a criminal case whenever he, in good faith, thinks that the
> prosecution would not serve the best interests of the state.  This
> discretion not to prosecute may be implemented by the district attorney's
> refusal to approve the private criminal complaint at the outset.

Id. (quoting Commonwealth v. Malloy, 450 A.2d 689, 692 (Pa. Super. Ct. 1982)) (emphasis

added).

This discretion demonstrates that a PFA does not create an entitlement protected by due

process.  See Castle Rock, 125 S.Ct. at 2796 ("Our cases recognize that a benefit is not a

protected entitlement if government officials may grant or deny it in their discretion.").  The

effect of this discretion is that, just as in Castle Rock, the plaintiff has the express power to

initiate civil contempt proceedings to enforce the PFA, but has the power merely to request

that the government initiate criminal proceedings.  Id. at 2809.

Castle Rock additionally reasoned that "[e]ven if the statute could be said to have made

enforcement of restraining orders 'mandatory' because of the domestic-violence context of

16

the underlying statute, that would not necessarily mean that state law gave *respondent* an entitlement to *enforcement* of the mandate." Id. at 2808.  Criminal law serves the "public rather than private ends." Id.  Pennsylvania Courts have adopted a similar view of the enforcement of PFAs, stating, "[A] PFA is not merely an agreement between private parties in which the Commonwealth has no independent interest. A violation of a PFA is a violation of the law, a public wrong, punishable by a fine, imprisonment, or both." Com. v. Majeed, 694 A.2d 336, 340 n.6 (Pa. 1997).

Finally, Plaintiff has no entitlement to the enforcement of a PFA because the benefit derived from enforcement is indirect.  "[T]he alleged property interest here arises incidentally, not out of some new species of government benefit or services, but out of a function that government actors have always performed - -to wit, arresting people who they have probable cause to believe have committed a crime." Castle Rock, 125 S.Ct. at 2809.  The defendants' actions did not directly affect Raienhna or Jacob, and the return of the weapon had an effect solely because Michael Bechtel independently decided to commit a heinous crime months later.  "[A]n indirect and incidental result of the Government's enforcement action . . .does not amount to a deprivation of any interest in life, liberty, or property." Id. at 2810 (quoting O'Bannon v. Town Court Nursing Center, 447 U.S. 773, 787 (1980)).

Accordingly, we find that Raienhna's Final PFA, either alone or in conjunction with the PFA Act, did not create a legitimate entitlement to its enforcement.  Therefore, Plaintiff has

17

not advanced an interest protected by the Due Process Clause.  "[T]he framers of the

Fourteenth Amendment and the Civil Rights Act of 1871, 17 Stat. 13 (the original source of §

1983), did not create a system by which police departments are generally held financially

accountable for crimes that better policing might have prevented."[5]  Id. at 2810.

C.     **Brady Claim**

Plaintiff's final section 1983 claim is based on an alleged deprivation of the deceased's

rights under the Brady Act, 18 U.S.C. § 922.  The defendants argue that we should dismiss this

claim because 18 U.S.C. § 922 does not create a private cause of action and instead is a

criminal provision.  Plaintiff counters that, although 18 U.S.C. § 922 does not create a private

cause of action, section 1983 creates a cause of action for violations of federal law, and thus

she may pursue a remedy for a violation of the Brady Act under section 1983.

Plaintiff misreads section 1983.  This statute provides a remedy for deprivations of

*rights* created by federal law, not for violations of federal law.  If a federal law creates no

substantive right, then a violation of that law does not give rise to a section 1983 claim.  "Every

person who . . . subjects, or causes to be subjected, any citizen of the United States or other

person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities

secured by the Constitution and laws, shall be liable to the party injured in an action at law." 42

---

[5] Castle Rock did observe that a state is free to provide for such liability under state law, and listed numerous state statutes creating such a state remedy.  Id. at 2810 n.15.

U.S.C. § 1983 (emphasis added).  The plain language of section 1983 establishes that "[a] plaintiff asserting a statutory claim under § 1983 has the initial burden of demonstrating that the statute creates a substantive right."  Nextel v. Kingston Township, 286 F.3d 687, 694 (3d Cir. 2002) (citing Blessing v. Freestone, 520 U.S. 329 (1997)).  Plaintiff has not carried this burden.  A federal statute creates a substantive right if it satisfies the following three conditions:

> First Congress must have intended that the provision in question benefit the plaintiff.  Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence.  Third, the statute must unambiguously impose a binding obligation on the States.  In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

Higgins v. Beyer, 293 F.3d 683, 689 (3d Cir. 2002) (quoting Blessing, 520 U.S. at 340-41).

The Brady Act provision relied upon by Plaintiff does not satisfy these criteria.[6]  It creates no class of protected individuals and imposes no binding obligation on the state.  Therefore, we find that 18 U.S.C. § 922 does not create a substantive right, and we will dismiss Plaintiff's section 1983 claims based on this statute.

---

[6] The Brady Act provision relied upon by Plaintiff provides "It shall be unlawful for any person to sell or otherwise dispose of any firearm . . . to any person. . . subject to a court order that restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child." 18 U.S.C. § 922(d)(8).

### D.    Failure to Train

In Counts III and IV, Plaintiff alleges that the defendants' failure to train their subordinate officers caused the violations of the deceased's constitutional and Brady Act rights, which she alleges is actionable under section 1983 pursuant to <u>Monell v. Dept. of Soc. Servs.</u>, 436 U.S. 658 (1978).  To succeed under a failure to train theory, Plaintiff must first establish that the failure to train caused a constitutional violation.  <u>Grazier v. City of Philadelphia</u>, 328 F.3d 120, 124-125 (3d Cir. 2003).  As we have determined that the defendants did not deprive the deceased of a right secured by the Constitution or the Brady Act, Plaintiff cannot maintain a "failure to train" cause of action.   Thus, we will grant the summary judgment motions and dismiss Plaintiff's section 1983 claims.

### IV.    Conclusion

The sole remaining claims are pendent state law claims against the Municipal Defendants.  As we will dismiss Plaintiff's federal claims in their entirety, we will dismiss the pendent state law claims for lack of jurisdiction.  <u>See United Mine Workers v. Gibbs</u>, 383 U.S. 715, 726 (1966).

In <u>DeShaney</u>, the Supreme Court observed:

> Judges and lawyers, like other humans, are moved by natural sympathy in a case like this to find a way for Joshua and his mother to receive adequate compensation for the grievous harm inflicted upon them. But before yielding to that impulse, it is well to remember once again that the harm was inflicted not by the State of Wisconsin, but by Joshua's father.

20

<u>DeShaney v. Winnebago County Dep't of Soc. Servs.</u>, 489 U.S. 189, 202-203 (1989).  Here too, we note that Plaintiff has suffered a grievous loss.  Michael Bechtel, however, inflicted this loss, not the defendants.  Section 1983 is not a "font of tort law. . . but it does not mean States are powerless to provide victims with personally enforceable remedies."  <u>Castle Rock</u>, 125 S. Ct. at 2810 (citations omitted).  Thus, Plaintiff has no section 1983 remedy for her claims, although she may have an enforceable state law remedy.  Absent a pendent federal claim, however, we have no jurisdiction over the state law claims.  Therefore, we will grant the motions for summary judgment and dismiss this case.  An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOAN STARR,** *individually* | : | No. 3:03cv636 |
| *and as Administratrix of the* | : | |
| *Estate of Raienha P. Bechtel and Jacob* | : | (Judge Munley) |
| *Bechtel,* | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CORPORAL SCOTT PRICE; ELIZABETH** | : | |
| **HONICKER; SCHUYKILL COUNTY;** | : | |
| **FRANCIS MCANDREW; CHRISTOPHER** | : | |
| **BAYZICK; THOMAS POWELL; ROBERT** | : | |
| **BETNAR; and WESLEY LEVAN,** | : | |
| **Defendants** | : | |

## ORDER

**AND NOW**, to wit, this 8th day of September 2005, the defendants' motions for summary judgment (Docs. 51, 53) are hereby **GRANTED**.  The Clerk of Court is directed to close this case and enter judgment on behalf of the defendants.

BY THE COURT:

s/ James M. Munley
**JUDGE JAMES M. MUNLEY**
**United States District Court**

22